hWICKER, Judge.
This appeal arises from a claim for additional worker’s compensation benefits and medical expenses filed on behalf of John D. Garner, plaintiff/appellant, against Pool Company, Defendant/appellee. Also made a party to the claim filed with the Office of Worker’s Compensation was Pool’s insurer, Employers National Insurance Company, defendant/appellee. The hearing officer rendered *129 judgment in favor of the defendants [1] We affirm.
Prior to the hearing the parties stipulated to the following pertinent facts:
(1) on November 7, 1988 Garner sustained an injury while he was in the course and scope of his employment as a floor hand with Pool;
(2) the accident occurred when Garner stepped into a hole in the drilling floor of a drilling rig;
(3) Garner lives in Pedal, Mississippi and had been employed by Pool for a considerable period of time prior to the accident;
(4) as a result of the accident Garner was treated by Dr. Edward A. Addix and Dr. Prentiss Walker, orthopedic surgeons in Hattiesburg, Mississippi;
(5) Garner requested his treatment be transferred to Dr. David Bomboy, another orthopedic surgeon in Hattiesburg;
(6) that request was approved by Pool;
(7) on November 29, 1988 Garner had a lumbar myelogram and a lumbar CAT-Sean;
(8) on February 27, 1989 Garner underwent a bone scan;
(9) in early March, 1989 Dr. Bomboy, who treated Garner conservatively, referred him to Dr. Ralph Wicker for a neurosurgical evaluation;
|2(10) after reviewing radiological studies Dr. Wicker found no abnormalities;
(11) Dr. Wicker recommended to Dr. Bomboy that Garner should attempt to return to work;
(12) Pool then terminated Garner’s worker’s compensation benefits;
(13) Garner retained attorney John Deakle who practices in Hattiesburg;
(14) Deakle associated Patrick Pendley, an attorney practicing in West Baton Rouge Parish;
(15) these attorneys referred Garner to Dr. John Watermeier, an orthopedic surgeon in New Orleans, Louisiana;
(16) Garner did not seek Pool’s approval when he changed his treating physician;
(17) Dr. Watermeier diagnosed Gamer as having a pathogenic intervertebral disk at the L4-5 level of his lumbar spine;
(18) Dr. Watermeier performed a diskec-tomy at that level on January 8, 1990;
(19) Garner underwent an MRI study on June 4, 1990 which indicated central disk herniations at the L4-5 and L5-S1 levels of his lumbar spine;
(20) during the period between the date of Garner’s alleged accident and the date of his surgery in early January, 1990 as well as the period of time following his surgery he remained an active member of a hunting club and participated in deer hunting, and
(21) Pool did not learn that Garner had surgery with Dr. Watermeier until January 27, 1990.
Garner seeks a reversal of the hearing officer’s refusal to order further medical benefits and worker’s compensation. He specifies the following errors on appeal:
1. The hearing officer erred in finding Pool only liable for the $750.00 in Subsection (B) of R.S. 23:1142 since Garner falls within the exception in Subsection (E) of the statute which provides that an employee need not seek permission of the employer when changing physicians if the employer denies liability;
2. The hearing officer erred in finding all of Garner’s medicals were paid in full when he was returned to work, since Garner could not, and still cannot perform any work because of the pain in his back, and because future surgery is necessary, and
3. The hearing officer erred in giving weight to Dr. Bomboy’s conclusion that the disc herniations must have been caused by some subsequent trauma or injury because the employer is liable for injuries which aggravate the preexisting injuries of plaintiff, even if they occur away from the workplace and there is no evidence of any such trauma.

JgACTS

The record evidence and stipulations establish that Garner was first treated by Drs. *130 Attix and Walker following the accident of November 7, 1988. The treatment involved hospitalization for traction at Methodist Hospital in Hattiesburg, Mississippi. Garner was hospitalized 10 to 11 days. Approximately two days after his release he changed to another orthopedic surgeon upon Pool’s approval. Dr. David Bomboy, the third treating orthopedic surgeon, treated him from November, 1988 until March, 1989. He treated him conservatively with physical therapy, pain medication, and exercises.
Dr. Bomboy’s medical report of December 26, 1988 gives a diagnostic impression of chronic lumbosacral strain. On March 6, 1989 Dr. Bomboy wrote Pool stating Garner continued to complain of pain but that he found no change in his physical exam.
The MRI and bone scan performed on February 27, 1989 were normal. Additionally, a lumbar myelogram and CT scan performed on November 29, 1988 were also normal. On March 6, 1989 Dr. Bomboy wrote Pool to state he had no explanation for Garner’s pain. He did note that whenever work was mentioned to Garner he reported worse pain.
Dr. Bomboy felt that as of March 6, 1988 Garner had reached maximum improvement insofar as what he had to offer. He recommended that Garner be seen by Dr. Ralph T. Wicker for a neurosurgical evaluation. He wrote that if Dr. Wicker did not find evidence of surgical disease then Garner should be released to return to work.
Dr. Wicker’s report dated March 9, 1989 stated that on examination Garner had no muscle spasm in the back although he complained of back pain upon manipulation or movement of the back in any direction. Additionally, his reflexes were normal.
On March 14,1989 Dr. Wicker reported he had reviewed Garner’s MRI, myelogram and CAT scan. He did not see “a ruptured disc or anything that would respond to a surgical procedure.” He recommended Garner begin “back hardening exercises and attempt to return to the work place.”
Garner did not return to work although released to do so by his treating orthopedic surgeon. Instead, he informed Pool he could not work because he had continuing back problems. After his release to return to work in March, 1989 he consulted an attorney. The attorney referred him to Dr. John Watermeier in New Orleans. He saw Dr. Watermeier the following month: April 5, 1989. pGarner’s last visit to Dr. Watermeier was August 5, 1992. Throughout that period Garner complained of back pain.
Dr. Watermeier testified that on April 5, 1989 he recommended Garner “remain totally disabled from his work.” He also recommended further tests: a repeat MRI and an initial thermogram. He stated he never did review the testing undertaken by Drs. Bom-boy and Attix.
On May 25, 1989 Garner had an MRI of the lumbar spine. Dr. Watermeier noted an abnormal disk at the L4-L5 level with degenerative changes at the disk above this level. The degenerative changes, however, did not involve nerve root impingement and were nonsymptomatic.
The thermogram was performed on April 5, 1989. Dr. Watermeier stated this showed he had a lower temperature in the left leg. On October 18, 1989 Garner had a disko-gram. Dr. Watermeier testified this test was positive at the L4-L5 level. On November 1, 1989 Dr. Watermeier recommended surgery on the low back area and Garner agreed. A lumbar laminectomy was performed January 8, 1990.
Dr. Watermeier stated that during surgery he identified a disk herniation with impingement on the nerve root. Prior to surgery Dr. Watermeier had been treating Garner conservatively with anesthetic injections in the back, pain medication, and a corset or brace.
Following surgery Garner continued to complain of back pain. Dr. Watermeier testified that on February 5th, 9th, and 16th of 1990 he withdrew fluid from the operative area. He viewed this condition as a normal accumulation of fluid following surgery. On visits after the surgery Dr. Watermeier also treated Garner with prescribed exercises, pain medication, anesthetic injections, and a brace.
*131 On June 4, 1990 another MRI was performed. Dr. Watermeier felt this MRI showed scar formation and recurrent disk herniation on the left side. He stated there were also signs of additional disk material protruding on his nerve root. He felt that if Garner did not improve he would need further surgery Dr. Watermeier explained that the purpose of the additional surgery was to remove a portion of the disk which was impinging on the nerve root. On July 24, 1990 he advised Garner he might need further surgery. Garner agreed to a second operation. On October 10, 1990 Dr. Watermeier recommended an EMG test of the lower extremities and an anterior fusion because he was still having problems. Dr. Watermeier stated the EMG indicated abnormalities in both L5-S1 nerves.
|5He estimated the cost of the surgery to be $30,000.00 to $35,000.00. After a 12 to 18-month recovery period he expected Garner to have a 15 to 20 percent permanent partial impairment to the body as a whole. He did not recommend Garner return to heavy manual labor or to his former employment. Dr. Watermeier considered Garner totally disabled through November 5, 1992.
Dr. Watermeier testified that the work-related accident described to him by Garner was the type which would cause the injury he treated. Garner did not relate to him any other trauma between the time of the accident at Pool and the time he first saw him. On cross-examination Dr. Watermeier admitted that had he viewed any of Garner’s prior myelogram, CAT scan and MRI those tests would affect his opinion in this ease.
At trial he was shown an x-ray report dated November 29,1988 and a lumbar mye-logram. This report indicated an indentation at L4-L5. Dr. Watermeier explained the implication was that there was a bulging disc or a herniated disc.
In contrast, however, the roentgenologist who authored the lumbar myelogram report, Dr. Hernand Velez, noted:
“There is only a very subtle anterior shallow indentation on the anterior wall of the thecal sac at L4-L5. This, however, could be misleading since the anterior epidural space from the pedicles of L5 to SI is wide and generous in size. Contents of the anterior epidural space would be better depicted by the CT myelogram images scheduled for this afternoon.”
The afternoon test was reported to be normal. Both Drs. Bomboy and Wicker viewed the prior testing as normal.
On October 24, 1990 Dr. Bomboy wrote a letter explaining his review of the later testing ordered by Dr. Watermeier. While the later tests showed changes which were not present in the earlier ones he had requested these changes did not “evidence any nerve root pressure or other causation that would indicate surgery would be of any benefit.” Dr. Bomboy did note “small herniated disks” which were not present before. He opined:
“The explanation of these changes would have to come from the patient in that I would expect subsequent trauma or injury to have occurred since the time [he] saw [Garner] last and the time he had his last MRI examination on 4 June 1990.”

LEGAL ANALYSIS

Garner argues the hearing officer erred in limiting his medical expenses to $750.00 pursuant to La.R.S. 23:1142. La.R.S. 23:1142 provides that fees in excess of $750.00 for doctors performing 16nonemergency care are an unenforceable “obligation against the employee or the employer or the employer’s worker’s compensation insurer unless the employee and the payor have agreed upon the diagnostic testing or treatment by the health care provider.”
Clearly there was no agreement in this case by Pool for the expenses of Dr. Water-meier’s treatment. Garner correctly notes, however, that Section E of the statute provides an exception when the payor denies the injury is compensable. In this case Pool denied any further compensation and benefits once Garner had been released to return to work by Drs. Bomboy and Wicker.
Nevertheless, La.R.S. 23:1121(B) requires that the employee obtain prior consent before changing from his or her initial choice of a treating physician to another in the same field or specialty. In the instant case after *132 selecting a treating physician in the field of orthopedic surgery Garner changed to Dr. Watermeier, another orthopedic surgeon, without Pool’s approval. When the employer is arbitrary and capricious or without probable cause in withholding consent the employer is subject to paying “reasonable attorney’s fees related to th[e] dispute and for any medical expense so incurred by [the claimant] for an aggravation of the employee’s condition resulting from the withholding of such physician’s services.” La.R.S. 23:1121(C). Garner, however, does not seek entitlement to attorney’s fees or medical expenses due to aggravation. Instead he seeks payment by Pool of the medical expenses incurred with treatment by Dr. Watermeier as well as future medical treatment. He also seeks compensation claiming he is disabled.
While we recognize section E of La.R.S. 23:1142 provides an exception when Pool has denied compensation we nonetheless also recognize that Pool’s duty under La.R.S. 23:1203 was to “furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment ... [emphasis added].”
In Charles v. Aetna Casualty & Surety Company, 525 So.2d 1272, 1275 (La.App. 3rd Cir.), unit denied, 531 So.2d 480 (1988) the court explained:
Under R.S. 23:1203 a worker’s medical expenses are compensable only if they are occasioned by the work-related injury. McCoy v. Kroger Co., 431 So.2d 824 (La. App. 2nd Cir.1983). The claimant must establish his claim for medical benefits and show that they are related to the work accident to a reasonable certainty and by a preponderance of the evidence. Steven v. Liberty Mutual Ins. Co., 509 So.2d 720 (La.App. 3rd Cir.1987).
Accord Tassin v. New Orleans Delivery Service, 550 So.2d 1214, 1217 (La.App. 5th Cir.1989).
|7The hearing officer evidently concluded the charges by Dr. Watermeier were unnecessary because these were not “related to the work accident to a reasonable certainty and by a preponderance of the evidence.” Tas-sin, supra at 1217.
The hearing officer referred to Dr. Bomboy’s conclusion in his reasons for judgment whereby Dr. Bomboy opined that changes observed by Dr. Watermeier and present in the testing were not there prior to this time and must have been caused by a subsequent trauma or injury. Garner correctly notes there is no evidence in the record of a subsequent trauma or injury. However, the proper inquiry is whether the disc herniations present in the later testing by Dr. Watermeier were “related to the work accident to a reasonable certainty and by a preponderance of the evidence.” Tassin, supra at 1217.
“The findings of fact of a hearing officer are subject to the manifestly erroneous standard of review.” Charles v. Travelers Ins. Co., 627 So .2d 1366 (La.1993) at 1370. The Travelers court also held:
Thus, “a reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.” Rosell v. Esco, 549 So.2d 840, 844^15 (La.1989).
The hearing officer had conflicting testimony as to the cause of the herniations in the disc noted subsequent to Garner’s release to work by his treating physician. Dr. Water-meier, who did not review Garner’s prior tests, testified the herniations were consistent with the work-related accident. Dr. Bomboy wrote these were not related to the work accident. Dr. Bomboy based his opinion on the absence of abnormality in testing prior to Dr. Watermeier’s testing. Garner was released to return to work by two physicians who viewed his testing as normal in March, 1989. Two months later, on May 25, 1989 the MRI ordered by Dr. Watermeier showed an abnormal disk at the L4-L5 level.
We find no manifest error in the hearing officer’s attaching greater weight to the opinion of Dr. Bomboy, Garner’s treating physician for the four-month period immediately following the accident. Importantly, Dr. Bomboy also noted that the changes observed in the later testing do not evidence nerve root pressure or any other causation for surgical intervention.
*133 Accordingly, for the reasons stated, the judgment is affirmed.

AFFIRMED.

. He allowed a maximum of $750.00 for additional medical expenses.